## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 16bk34329 |
| | ) | Chapter 7 |
| Kirk P. Mauriello, | ) | |
| | ) | |
| Debtor. | ) | Judge LaShonda A. Hunt |
| | ) | |
| | ) | |
| Peter N. Metrou, not individually but as the | ) | Adversary No. 18ap00290 |
| Chapter 7 Trustee of the estate of Kirk P. | ) | |
| Mauriello, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Cami Kaczor-Mauriello f/k/a | ) | |
| Cami Kaczor, Stephen R. Chura, | ) | |
| David Kaczor, and Old Plank Trail | ) | |
| Community Bank, N.A., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Peter N. Metrou, chapter 7 trustee of the estate of Kirk Mauriello ("Debtor"), initiated this adversary proceeding against Cami Kaczor-Mauriello f/k/a Cami Kaczor ("Cami"), Stephen Chura ("Stephen"), David Kaczor ("David), and Old Plank Trail Community Bank, N.A., ("Old Plank") (collectively, "Defendants"). The Trustee seeks to avoid an indirect transfer of $85,000 from Debtor to Old Plank under 11 U.S.C. § 544, and to recover the funds from Defendants under 11 U.S.C. § 550. The case proceeded to trial, where Debtor asserted his Fifth Amendment privilege and refused to testify. For the reasons that follow, the Court finds that the Trustee has not met his burden of establishing an avoidable transfer under section 544. Accordingly, judgment will be entered in favor of Defendants on all claims.

1

**PROCEDURAL HISTORY**

Debtor filed a voluntary petition for chapter 7 relief on October 27, 2016. The Trustee timely commenced this three-count adversary complaint against Defendants to avoid fraudulent transfer and related relief. According to the amended complaint, in June 2013, Debtor obtained an $85,000 loan from his boss, Joe Aurelio ("Joe"), President and CEO of Aurelio's Pizza, Inc. and related business entities (collectively, "Aurelio's"). Debtor directed that the check, which was drawn on the bank account of an Aurelio's entity that did not employ him, be made payable to Old Plank to repay a second mortgage owed by Cami and David for a property owned by Cami and Stephen.

Old Plank subsequently moved for summary judgment on the grounds that the payment was not an actionable transfer from Debtor, or alternatively, Old Plank was a subsequent transferee who took the funds in good faith. That motion was denied by the then-presiding judge who found disputed factual issues existed on both points.[1]

Following discovery, the parties proceeded to a four-day Zoom trial at which multiple witnesses testified—Cami, Stephen, David, and Candi Pesavento ("Candi"), an Assistant Vice-President at Old Plank; Joe and his controller/assistant/secretary Dawn McCord ("Dawn"); and the Trustee and his expert witness on insolvency Michael Pakter ("Pakter").

Debtor was subpoenaed as a witness by the Trustee and appeared with counsel but refused to answer any questions. In August 2017, Debtor had been criminally indicted by a Cook County grand jury on five counts of financial crimes that his counsel believed were related to the facts of the instant proceeding. Given that the criminal case was still pending at the time of this trial, on

---

[1] Chief Bankruptcy Judge Pamela Hollis issued that ruling in September 2019. She retired from the bench in January 2020, at which point this adversary proceeding was reassigned.

the advice of counsel, Debtor invoked the Fifth Amendment in response to each question by Trustee counsel.[2]

This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.

## JURISDICTION

The court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(H) in which the Trustee seeks to avoid and recover a fraudulent conveyance.

## FINDINGS OF FACT

The Court makes the following findings of fact based on the pretrial stipulations, testimony, and admissible evidence presented at trial.  In addition, the Court takes judicial notice of the dockets in the bankruptcy case and adversary proceeding.  *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989).  The relevant facts are largely undisputed.

## I.    Background

1.    Cami was Debtor's non-filing spouse when he filed a bankruptcy petition in October 2016, and his fiancée at the time of the transfer to Old Plank in June 2013.

2.    At all material times, Cami lived at 12426 Chiszar Drive, Mokena, Illinois 60448 ("Mokena Property"), and was listed on the title of the Mokena Property.

---

[2] On the first day of trial, the Trustee orally moved to deem Debtor unavailable as a witness under Fed. R. Evid. 804(a), and to admit his sworn testimony from a state court deposition in a wage action against Aurelio's and a Fed. R. Bankr. P. 2004 examination in the bankruptcy case, under Fed. R. Evid. 804 and 807.  Defendants objected, citing among other issues, the lack of similarity of parties/motives or an opportunity for cross-examination. The Court agreed and denied the oral request. The Trustee subsequently renewed the motion in writing and included supporting authority.  After considering the arguments of the parties, the Court granted the motion in part, concluding Debtor was unavailable and admitting one statement from the wage claim deposition that satisfied Fed. R. Evid. 804(b)(3).

3

3. Debtor was never placed on the title to the Mokena Property or any loan secured by the Mokena Property, even after he and Cami were married in July 2013.[3]

4. David is Cami's former spouse. David and Cami acquired title to the Mokena Property in March 2007. Although they divorced in January 2011, David remained on the title until April 2013.

5. Stephen is Cami's father. In April 2013, the Mokena Property was transferred from Cami and David to Cami and Stephen as joint tenants.

6. Old Plank is a national banking association. As of June 2013, David and Cami held a revolving line of credit with Old Plank not to exceed $87,000 and secured by a mortgage against the Mokena Property (the "Loan"). In addition, David, and Cami were obligated on a first mortgage against the Mokena Property held by MBLO Lending, Inc. ("MBLO").

## II. Debtor's Pre-Loan Financial and Employment History

7. In July 2010, Debtor and his first wife Anne Mauriello ("Anne") were granted a judgment of dissolution of marriage.

8. Under their marital settlement agreement, Debtor was required to pay Anne spousal support of $6,700 per year based on gross income of $96,000, and then 10% on gross income in excess of $96,000, including bonuses, for 48 months thereafter. As for child support for their four children, Debtor was required to pay Anne $28,355 per year based on gross income of $96,000, and 40% of gross income in excess of $96,000 including bonuses. Debtor also had to maintain medical, dental, and vision insurance coverage for the children.

9. Sometime in 2010, Debtor took up residence at a second home owned by he and Anne at 6015 Osprey Dr, Watervliet, Michigan 49098 (the "Michigan Home"). Their marital settlement

---

[3] Debtor moved out of the Mokena Property in February 2019. He and Cami's divorce was finalized in January 2020, and Cami sold the Mokena Property later that year.

agreement provided for the sale of the Michigan Home with 40% of the proceeds awarded to Debtor and 60% to Anne. The Michigan Home was eventually sold in January 2013.

10. Previously in 2008, Debtor had met Joe at his Michigan Home. Joe and his wife were visiting friends who lived next door to Debtor and Anne. Debtor and Joe developed a friendship over the years. Debtor invited Joe to stay in the Michigan Home a few times.

11. Joe knew that Debtor had worked long-term for another company and was impressed by the fact that Debtor was a numbers guy. When they talked, Debtor would often ask Joe how the pizza business was doing. Around 2010, Debtor mentioned to Joe that he was losing his job and asked if Joe needed anyone at Aurelio's.

12. In February 2010, Joe hired Debtor as Director of Franchising for Aurelio's is Pizza Franchise, Ltd. ("Aurelio's Franchise"). Debtor served as the direct contact and point person for all franchisees. He was one of the highest paid corporate staff workers at Aurelio's because Joe believed Debtor had more value as a numbers guy.

13. Debtor proposed an Employment Term Sheet with an annual salary of $96,000 and certain incentives to be paid if Debtor opened up seven new stores a year. Joe agreed and signed the term sheet in February 2010. Debtor never received any of those incentives, though, as Aurelio's closed several stores in his first year.

14. In December 2010, Debtor approached Joe and told him that Debtor was not meeting his goals. Debtor proposed that they dissolve the term sheet and Joe would pay for Debtor's Cubs season tickets. Joe concurred and they tore up the contract. Debtor never proposed and Joe never signed another term sheet. Thereafter, Debtor was paid annually his salary of $96,000.

15. Sometime in 2011, Joe required surgery and treatment that necessitated him stepping away from the business for several months. Debtor ran Aurelio's operations in Joe's absence. Joe trusted Debtor and believed he would do a good job and would be an honest employee.

16. In 2013, Debtor proposed that Joe name him chief operating officer of Aurelio's Franchise and Joe agreed.[4]

### III. The $85,000 Payment

17. In 2010, Debtor and Cami met and began dating.

18. In January 2011, Cami and David entered into a marital settlement agreement that provided for Cami to retain possession of the Mokena Property and be solely responsible for payment of the mortgages. She was also entitled to 100% of the net proceeds from any sale.

19. Cami agreed that if she remarried or chose to cohabitate with an unrelated member of the opposite sex at the Mokena Property, she was required to remove David's name from the primary mortgage and the Old Plank mortgage within six months of her remarriage or cohabitation. If not, Cami was obligated to sell the Mokena Property.

20. By February 2013, Cami and Debtor were engaged and he had moved into the Mokena Property with her.

21. Upon learning of their cohabitation, David filed a motion before the divorce court to force Cami to remove his name from the mortgages. At that time, there was enough equity in the Mokena Property to pay off the mortgages if the house was sold.

---

[4] According to the joint stipulation, Debtor started as a Director of Franchising before becoming Chief Financial Officer. His exact title is not relevant to the analysis.

22. In April 2013, the Mokena Property was transferred from Cami and David to Cami and her father Stephen. However, Cami and David were still obligated under the Loan with Old Plank.

23. In June 2013, David and Cami reached a settlement giving her an additional 30-45 days to take his name off the mortgages or else he would petition to force the sale of the Mokena Property.

24. Cami and Stephen tried to refinance the mortgages encumbering the Mokena Property to remove David but were told they could not refinance the first mortgage to MBLO without first satisfying the Old Plank loan.

25. When Cami shared this information with Debtor, he responded that Aurelio's would help and he would take care of it.

26. Starting in approximately 2012, Debtor had created a position for Cami as an independent contractor with Aurelio's Franchise working directly with franchisees to build their social media presence. Cami worked from home and was paid $500 per week for her services until 2015 when Debtor left Aurelio's.

27. Joe never worked directly with Cami and had no relationship with her independent of Debtor.

28. The Aurelio's business consisted of several entities—Aurelio's Pizza, Inc., the main corporate headquarters in Homewood, Illinois; Aurelio's Quality Products ("Aurelio's QP"), the supply chain system and distribution center in Mokena, Illinois; and Aurelio's Franchise, along with three corporate restaurants and 37 franchised restaurants. Joe was in charge of the entire operation as President and CEO.

29. Aurelio's is a family-owned business. Joe and his three siblings each hold 25% shares in the company. Everyone on the corporate staff worked their way through the system or was part of the family. Debtor was the first outsider Joe hired into management.

30. Joe had previously authorized a short-term loan to Debtor for approximately $11,000 without drafting a loan agreement or establishing repayment terms. Debtor repaid those funds.

31. On or about June 27, 2013, Debtor walked into Joe's office and told him he needed to borrow $85,000 to help his then-fiancée Cami pay off her mortgage to remove her ex-husband David's name from the Mokena Property.

32. Joe agreed to the loan. Cami was not present during their conversation.

33. Joe and Dawn have connecting offices. She has worked with him since 2008 handling accounts payables for Aurelio's. Dawn described Joe as having no clue about numbers and leaving those details to her.

34. Joe and Debtor walked into Dawn's office, where Joe told her that he had agreed to lend Debtor $85,000 and asked which of the Aurelio's entities was the strongest from which to pull the money. Dawn replied that Aurelio's QP had the most money at the time.

35. Joe left Dawn and Debtor in her office to work out the details of the loan arrangement. Joe testified that Debtor was free to do what he wanted with the loan even though Debtor had already said the money would be used to pay off Cami's mortgage.

36. Joe had no idea exactly what Debtor planned to do or how he intended to repay the funds. But he expected the loan to be repaid by Debtor, since Debtor asked for the money and worked for him in a trusted role. It was not Joe's intent to have Cami be obligated on the loan.

37.  Debtor told Dawn to write the check out to Old Plank instead of himself, and Debtor would take it directly to the bank and fill in the loan number which he did not have with him.  Joe was not present in Dawn's office during that discussion.

38.  Dawn prepared check number 5619 issued from Aurelio's QP on its Great Lakes Bank, N.A. account, dated June 27, 2013 and made payable to Old Plank for $85,000.  Dawn stamped Joe's signature onto the check and gave it to Debtor.

39.  That same day, Dawn called the company's outside accountant, Ed Ipema ("Ed"), and told him to prepare a promissory note and amortization schedule on a yearly basis for a short-term loan of $85,000.  Ed emailed to Dawn a draft promissory note with a five-year term at .95% interest and annual payments to Aurelio's QP of $17,487.55 due on or about June 27 of each year.  The payee information was left blank.

40.  Dawn printed the note the next day.  Debtor told her to type in Cami's name and the Mokena Property address and give him the document.  He would have Cami sign the note and then he would return it to Dawn.

41.  Dawn never saw the note again and never followed up with Debtor or Cami about execution.   The $85,000 loan was listed on Aurelio QP's tax return as a receivable.

42.  Cami never saw the note nor was asked by anyone to sign a note.

43.  Cami never made a payment on the note.

44.  Cami did not ask Debtor, Joe, or any of the Aurelio's entities for an $85,000 loan.

45.  Debtor took the $85,000 check home and handed it to Cami.  He did not tell Cami how he got the money and she did not question him either.  Cami did not believe she had to repay the $85,000 to Aurelio's.

9

46.  On or about June 28, 2013, Cami tendered the check to Candi at one of Old Plank's branch locations.  David was present with her.

47.  The payment was not sufficient to payoff the Loan.  Cami wrote an additional personal check in the amount of $2,083.81 to cover the shortfall.

48.  Old Plank accepted the $85,000 check from Aurelio's QP and the $2,083.81 check drawn by Cami, and applied the funds to the Loan.  Cami and David, as customers of Old Plank, signed a form to close out the line of credit.

49.  Old Plank released David and Cami from their obligations on the Loan and released its mortgage against the Mokena Property.

50.  At the time that Old Plank received the $85,000 check, Aurelio's QP was neither a borrower nor a depositor at Old Plank.

51.  At the time that Old Plank received the $85,000 check, Debtor was neither a borrower nor a depositor at Old Plank.

52.  Old Plank is not a creditor of Debtor.

53.  A month after paying off the Loan to Old Plank, Cami and Debtor were married in Las Vegas.  Joe attended the wedding and paid for their honeymoon suite for several days.

54.  Throughout their relationship, Cami, and Debtor kept their finances separate.  They never combined money and Debtor did not voluntarily discuss his financial situation with her. Cami had her own separate bank account and they split bills.  Debtor did not pay rent to live at the Mokena Property or ask Cami to pay any of his obligations.  Cami never asked Debtor to lend her money.

10

## IV.    Debtor's Bankruptcy Filing

55.  By 2014, the relationship between Debtor and Joe had become tense.  In May 2015, while at a construction site for a new Aurelio's location, Debtor got into a verbal and physical altercation with Joe and the general contractor, and quit his job.

56.  About a month later, Debtor initiated a state court lawsuit against Aurelio's Franchise and Joe for alleged unpaid wages in excess of $100,000.

57.  Aurelio's QP and Joe filed a counterclaim against Debtor for damages resulting from alleged financial improprieties committed during his employment.   Aurelio's QP and Aurelio's Franchise also filed a third-party complaint for breach of contract against Cami and Debtor for the $85,000 loan.

58.  Debtor subsequently proposed to resolve the litigation by offsetting the $85,000 against amounts allegedly owed to him by Aurelio's Franchise.

59.  At a subsequent deposition in the state court proceeding, Debtor bragged that the $85,000 from Aurelio's was a salary payment disguised as a loan to avoid his financial obligations to Anne.

60.  Debtor never repaid any of the $85,000 loan.  Dawn did not follow up with him about payment.  Joe did not make any effort to collect after Debtor said he was running into problems and could not make the payments.  Joe responded that was okay because Debtor was working hard for him and Joe knew the money would be repaid.

61.  Cami, Stephen, and David never repaid any of the $85,000 loan to Aurelio's QP. Neither Joe nor Dawn followed up with any of them about payment.

62.  In October 2016, Debtor listed Aurelio's QP as a creditor on his bankruptcy Schedule E/F for an $85,000 unsecured debt he owed based on a "personal loan."

11

63. Aurelio's QP filed a proof of claim in Debtor's bankruptcy case for $87,687.98. Attached as evidence of the indebtedness was a copy of the $85,000 check payable to Old Plank, along with the unsigned note with Cami's name typed on it, an amortization schedule, and an interest calculation. The basis for the unsecured debt was "money loaned."

64. At his deposition in the wage claim suit, Joe acknowledged that the loan in his eyes was with Cami because he went with her to the bank to pay off her mortgage and she was Debtor's fiancée. Joe later admitted that he did not in fact go to Old Plank with Cami. Joe also testified at the deposition that he gave Debtor the money to pay off Cami's loan.

65. Joe authorized his attorney to file the counterclaim against Cami for breach of contract on the $85,000 note in the state court action.

66. Joe authorized his attorney to file the proof of claim in Debtor's bankruptcy case with the note bearing Cami's name.

## V.    **Expert Insolvency Analysis**

67. Michael Pakter ("Pakter") is a certified public accountant licensed and registered in the State of Illinois who holds various professional certifications and has 40 years of experience. He was hired by the Trustee to determine Debtor's financial solvency as of June 27, 2013, the date of the transfer to Old Plank.

68. Pakter was admitted without objection as an expert in the field of insolvency. He prepared an expert report dated February 19, 2021, in which he opined, to a reasonable degree of accounting certainty, that on June 27, 2013, Debtor failed to meet the three traditional tests of solvency—balance sheet, cash flow, and capital adequacy.

69. For the balance sheet test, Pakter reconstructed and summarized the fair value of Debtor's available assets and liabilities on June 27, 2013.

12

70.  Pakter concluded that Debtor had total assets of $24,368.  He did not assign or include a value for the wage claim that Debtor had estimated to be worth $220,000.

71.  Pakter concluded that Debtor had total liabilities of $132,381, inclusive of the $85,000 loan.  Pakter also assumed that Debtor had more credit card debt than reported.  Accordingly, he used $30,381 from a December 2013 financial affidavit completed by Debtor in his post-divorce proceedings rather than the $18,255 that was reflected as of the June 2013 date.

72.  For the cash flow test, Pakter used forensic accounting to track Debtor's typical cash inflows and outflows for an average month at or near June 27, 2013.

73.  Pakter concluded that Debtor had two sources of monthly cash flow—his Aurelio's salary of $8,000 and IRA withdrawals averaging $2,900—for a total of $10,900.  But Pakter excluded the retirement funds from the calculation as an unsustainable income source that would end once the account was depleted.

74.  Pakter concluded that Debtor had an average monthly outflow of $9,288, which did not include payment on the Aurelio's loan.

75.  For the capital adequacy test, Pakter concluded that since Debtor had exhausted his retirement funds, he had no reserves and thus lacked adequate capital.

76.  The tests relied on by Pakter are generally applied to analyze solvency of corporations and other entities, not individuals.

## **CONCLUSIONS OF LAW**

Section 544 of the Bankruptcy Code provides, in relevant part, that:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544.  Fraudulent conveyance laws protect "creditors from last-minute diminutions of the pool of assets in which they have interests." *Bonded Fin. Serv. v. European Am. Bank*, 838 F.2d 890, 892 (7th Cir. 1988).  As such, section 544 allows the trustee to exercise the rights of creditors under state fraudulent transfer statutes and avoid certain transfers of an interest of the debtor in property. *Leibowitz v. Parkway Bank & Tr. Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 576-77 (7th Cir. 1998).   In this case, the Trustee asserts claims against Defendants under the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), based on actual fraud under 740 ILCS § 160/5(a)(1)(Count I) and constructive fraud under 740 ILCS §§ 160/5(a)(2) and 6(a)(Count II).

Generally, "it is only after a transfer is determined to be avoided under one of the avoiding powers provisions, that the trustee turns to § 550 to determine to whom he may look for recovery of the property." *Covey v. American Inv. Serv., et al. (In re Cost Reduction Serv., Inc.)*, 284 B.R. 433, 435 (Bankr. C.D. Ill. 2002).  The Trustee contends the avoided transfer is recoverable jointly and severally from Old Plank as recipient of the transfer and Cami, Stephen, and David who benefitted from the transfer (Count III).

In their joint pretrial statement and at trial, the parties identified four factual disputes to be resolved: (1) whether Debtor had a property interest in the $85,000; (2) whether any transfer of the $85,000 to Old Plank involved Debtor's actual intent to hinder, delay, or defraud any creditor of Debtor; (3) whether on or about June 27, 2013, Debtor was insolvent or otherwise in a financial condition within the meaning of 740 ILCS §§ 160/5(a)(2)(A) and (B); and (4) whether David

benefitted from any transfer of the $85,000.  Upon consideration of the evidence and the arguments of the parties, the Court finds that Debtor did not have a sufficient interest in the $85,000 for fraudulent conveyance purposes.  Even if that is not the case, the Trustee has not met his burden of proving the transfer was actually or constructively fraudulent.  Accordingly, the Court need not reach the question of whether Defendants are transferees or beneficiaries that can be held liable for a fraudulent transfer under section 550(a).[5]

I.      **No Transfer of an Interest in Debtor's Property**

The Trustee contends that Debtor's transfer of the loan proceeds to Old Plank constitutes a recoverable transfer of an interest in Debtor's property.   In support of that argument, the Trustee cites *Matter of Smith* where the Seventh Circuit observed that "[a]s a general rule. . . a debtor's transfer of borrowed funds is a *preferential transfer of the debtor's property under section 547(b). . .*" 966 F.2d 1527, 1533 (7th Cir. 1992) (emphasis supplied).  In *Smith*, the court discussed cases analyzing transfers arising in the preference context, and explained that a trustee is allowed to recover funds in those situations because "debtor had exercised control by selecting a creditor and had paid out funds (albeit borrowed funds) that could have been distributed to the class of creditors generally." *Id.* at 1534.  That rationale makes sense for a statutory avoidance power designed "to promote the prime bankruptcy policy of equality of distribution among creditors" and "[to] take away the incentive for such competitive last-minute asset-grabbing." *Id.* at 1535 (citation and quotation omitted).

But fraudulent conveyance actions have a different objective.  *See e.g., Bonded Fin. Serv.*, 838 F.2d at 892 ("The fraudulent conveyance must be distinguished from a preferential transfer to a creditor, which does not diminish the total payoff for the group. . . .).  There are "limits on the

---

[5]  Because David (Cami's ex-husband) specifically raised the issue of whether he received any benefit from the transfer, his argument will be addressed.  *See* Section IV, *infra*.

pursuit of [fraudulent] transfers," precisely because the "principle has been generalized to address transfers without either sufficient consideration or bad intent, for they, no less than gifts, reduce the value of the debtor's estate and thus the net return to creditors as a group." *Id.* Consequently, it is not enough here that Debtor orchestrated a loan from Aurelio's and the subsequent transfer of proceeds to Old Plank. Instead, the Court must consider the totality of the circumstances to determine whether the policies of section 544 are sufficiently implicated by the transaction. The analysis in *Smith*, a preference action under section 547, is not germane.

However, another case relied on by the Trustee, *Carmel v. River Bank Am.*, *et al. (In re FBN Food Servs.)*, arises in the fraudulent transfer context and presents a fact pattern "analogous to cases in which the Debtor directs a party to pay money due the Debtor to another party." 175 B.R. 671, 683 (Bankr. N.D. Ill. 1994). The bankruptcy court held that even though the debtor never possessed the funds, "the transaction is treated the same as if the debtor transferred the funds, instead of the third party." *Id.* And where "the effect is to defraud creditors, the transfer will be avoided." *Id.*

The Trustee argues that is exactly what transpired here. Stated another way, "A has a claim against B, and instead of B paying A directly for the claim, A directs B to pay C," and under those circumstances, "[t]he transfer from A to C is an indirect transfer of A's property." *Id.* According to the Trustee, "A" is Debtor, "B" is Aurelio's and "C" is Old Plank. It is undisputed that in June 2013, Joe agreed to lend Debtor $85,000 that was used to repay Cami's Loan to Old Plank via a check from Aurelio's QP. While it is not entirely accurate to state that Debtor (A) had a "claim" against Aurelio's (B), it is true that he was promised loan proceeds which Debtor (A) asked Aurelio's (B) to pay to Old Plank (C). At first glance, this situation looks just like *Carmel*. But there is one critical detail that distinguishes the instant case—Debtor (A) did not owe a debt to Old

16

Plank (C).  The Trustee can only avoid the transfer if Debtor had an interest in the transferred funds.  Because Debtor paid a non-creditor, the outcome hinges on the extent to which Debtor had control over the transferred funds.

The Trustee maintains that after Joe approved the loan, everything else, from designating the proceeds recipient to delineating repayment terms, was done under the direction and control of Debtor.  He relies on *Kapila v. Espirito Santo Bank (In re Bankest Cap. Corp.)*, in support of his argument.  374 B.R. 333 (Bankr. S.D. Fla. 2007).  That court examined "whose interests are primarily served by the challenged transaction," and explained that "where the debtor's interests do not provide the impetus for the transaction. . . courts are more likely to find that there was no fraudulent transfer of property of the debtor."  *Id.* at 339 (citation omitted).  The trustee there successfully established that money originating from a third-party loan to debtor for debtor's exclusive use evinced dominion and control over the disposition.

But those facts are easily distinguishable from this case where the record reveals Debtor sought and used the Aurelio's loan proceeds to primarily serve *Cami's* interests rather than his own.  Defendants cite two cases that are instructive and more applicable.  In *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, the Eleventh Circuit analyzed whether "funds provided to a debtor by a third party become property of the debtor so that an allegedly fraudulent transfer of the funds to a noncreditor is subject to avoidance under [section] 548."  813 F.2d 1177, 1180 (11th Cir. 1987).  The court noted the trustee erroneously overemphasized preferential transfer cases where the source of payment was a party other than the debtor.  Like the Seventh Circuit in *Smith*, *supra*, the Eleventh Circuit acknowledged the significant differences between the two types of avoidable transfers and by extension, a debtor's level of control:

17

> The presumption that the debtor controlled the payment is not similarly compelling where funds provided by a third party are transferred to a noncreditor. By definition, such transfers are not effected to repay an existing obligation of the debtor. Indeed, such transfers do not provide any benefit whatsoever to the debtor.

*Id.* at 1181.

In other words, control cannot be presumed from the mere fact of a transfer. Indeed, "where a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use." *Id.* In *Nordberg*, the court concluded the debtor had no interest in money from its president that quickly passed in and out of special bank accounts opened in debtor's name, finding the connection "quite tangential." *Id.* at 1182. *See also Carmel*, 175 B.R. at 685 (describing the debtor's interest as too "fleeting" to satisfy the "control test").

Debtor's interest in the transferred funds here is equally attenuated. He used his personal relationship with Joe to secure substantially all of the funds Cami needed to pay off a time-sensitive debt. Consistent with that intention, Debtor instructed Aurelio's to pay Old Plank directly, he wrote in the loan number for the Mokena Property on the check, and he gave it to Cami to hand-deliver to her bank. In addition, when Dawn asked who would be financially responsible for the resulting promissory note, Debtor identified Cami. The Trustee has not presented evidence that Debtor sought the loan for himself, let alone attempted to deposit the funds into his personal bank account. At best, Debtor was the equivalent of a middleman brokering a transaction for a third party. He and Cami maintained separate finances and he was not entitled to any of the equity in her home. Thus, any benefit he gained from a transfer that helped Cami avoid a forced sale of the Mokena Property—aside from playing the hero for his fiancée—was minimal.

18

Likewise, the circumstances of the transaction in *A.W. Lawrence Co. v. Burstein, et al. (In re A.W. Lawrence & Co., Inc)* relied upon by Defendants, illustrate the same type of conduit relationship that fails to form the basis for an avoidable transfer.  346 B.R. 51 (Bankr. N.D.N.Y. 2006).  In that case, debtor's principal entered into a settlement agreement with a former employee that required installment payments by certain dates.  *Id.* at 53.  In an entirely separate transaction, debtor purportedly sold a sailboat to the principal's wife for $50,000, which she paid for with a check payable to debtor and drawn on her personal account.  *Id.*  Debtor's principal then had his wife's check endorsed to the former employee on the same day that a $50,000 settlement payment was due.  *Id.* at 54.  The wife's check was never deposited into any of debtor's bank accounts or recorded in its general ledger.  *Id.*  Furthermore, the settlement payment was not owed by debtor. *Id.*

Applying the framework of *Nordberg*, the bankruptcy court ruled the debtor never had an interest in the funds because the transfer was used to serve the interests of debtor's principal who personally owed the repaid debt.  *Id.* at 58.  More importantly, since the $50,000 check never passed through debtor's bank account, those funds "did not diminish monies available to pay its creditors."  *Id.*

The evidence here supports similar conclusions as in *A.W. Lawrence & Co.*  The sole purpose for Debtor obtaining the loan and subsequently transferring the proceeds to a third-party non-creditor was to repay a debt he irrefutably did not owe.  The timing of the transaction validates that conclusion, as the six-month deadline to refinance and Cami's negotiated extension with David were about to expire.  Even the amount Debtor borrowed from Aurelio's was almost exactly what Cami needed to pay off the Loan.  And none of Debtor's creditors were prejudiced, since the loan proceeds were neither deposited by Debtor nor designated for his debts.

19

Accordingly, the Trustee failed to show that Debtor had an interest in the $85,000 check from Aurelio's to Old Plank sufficient to form a basis for avoidance of the June 2013 transfer. Since the actual and constructive fraud counts also require a transfer of an interest of the debtor in property, they cannot succeed. *See Gierum v. Glick (In re Glick)*, 568 B.R. 634, 671 (Bankr. N.D. Ill. 2017). Defendants are entitled to judgment in their favor. Nevertheless, for completeness sake, the Court will explain why independent of the question of Debtor's property interest, neither actual nor constructive fraud has been shown.

## II.   No Intent to Defraud

Section 5(a)(1) of the IUFTA provides in relevant part that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor. . . [if debtor acted]. . .with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1). The Trustee contends that the $85,000 from Aurelio's was actually past-due compensation that Debtor structured as a loan to avoid triggering his support obligations to his ex-wife Anne and their children. By stashing those funds in Cami's house as equity, Debtor allegedly kept them away from his creditors.

That theory has some support in the record from Debtor himself. In May 2015, nearly two years after obtaining the $85,000 loan, Debtor abruptly quit his job at Aurelio's. Notwithstanding the promissory note requiring over $17,000 in annual payments every June, none had been made. In June 2015, Debtor sued his former boss and employer in state court for unpaid back wages. Conceding he still owed the full $85,000 and believing Aurelio's owed him over $200,000, Debtor proposed a global settlement that would offset the debt against his recovery. After Debtor filed for bankruptcy in October 2016, the Trustee continued the litigation on behalf of Debtor's estate and ultimately settled the matter for $10,000. However, Debtor suddenly claimed during a March 2017 deposition in the wage lawsuit that he and Joe concocted the loan story to shield $85,000 in income

20

owed to Debtor from taxation and from Anne. In other words, contrary to his pleadings in the state court action in 2015 and his bankruptcy filing in 2016, Debtor insisted in 2017 that there never really was a loan.

As an initial matter, Cami and Stephen point out that the check came from Aurelio's QP, not Debtor's actual employer, Aurelio's Franchise, and contend that dispels any notion that these funds constituted income. Although the argument makes logical sense, Joe's testimony suggests that he regularly commingled funds of the various Aurelio's entities since this was a family business and he was President and CEO of the entire pizza enterprise. So the source of the money is less relevant.

The Trustee insists that Debtor's testimony is the "smoking gun" that establishes his intent to defraud. It is true that direct proof of actual intent to defraud is not required and circumstantial evidence will suffice. *In re Peregrine Fin. Group, Inc.*, 589 B.R. 360, 371 (Bankr. N.D. Ill. 2018). When Debtor refused to testify at trial, the Trustee moved to admit his prior deposition testimony into the record as statements against interest of an unavailable witness under Fed. R. Evid. 804(b). The Court granted that request in limited part, thereby allowing an adverse inference to be drawn against Debtor with respect to this issue only.[6]

Even so, that does not mean Debtor's words must be taken at face value as the truth. To conclude that Debtor was scheming to defraud his creditors based solely on Debtor's self-serving testimony would require the Court to ignore the far more reliable corrorobating evidence in the record from Joe and Dawn, the Aurelio's personnel who agreed to the loan and facilitated preparation of the check and loan documents, respectively. Debtor, on the other hand, had every reason to lie in a proceeding where he had an axe to grind against his former employer who, by

---

[6] The Trustee presented nearly a dozen statements by Debtor for consideration but the Court determined that none except this one fell within the parameters of Fed. R. Evid. 804(b) or 807.

21

then, had contested his wage claim, filed a counterclaim against his then-wife Cami for the loan balance, and accused him of serious financial improprieties that ultimately led to his criminal indictment only a few months after the deposition. The only inference the Court draws here is that Debtor is willing to spin a tale to suit his own purposes and his credibility is highly questionable.

The Trustee has not pointed to any other evidence of fraudulent intent in the record. As already discussed, not a single creditor of Debtor's was prejudiced by the $85,000 payment from Aurelio's to Old Plank for Cami's benefit. Debtor's calculated decision to avoid routing the loan proceeds through his personal bank account directly to Cami or to Old Plank does show some level of forethought. Assuming his goal was to avoid extra scrutiny of the transaction by Anne or other creditors, the reality is that none of them are any worse off since they could not have staked a claim on those funds obtained to repay a third-party debt. Accordingly, actual intent to defraud Debtor's creditors with the transfer has not been established.

### III.    **No Proof of Insolvency**

Constructive fraud under section 5(a)(2) of the IUFTA does not require an express showing of fraudulent intent. *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005). *See also In re Kimmel*, 480 B.R. 876, 885 (Bankr. N.D. Ill. 2012). Fraud is presumed where "a debtor transfers property for less than adequate value and is thereby unable to meet his obligations." *Id.* Section (6)(a) of the IUFTA asks whether a debtor "was insolvent . . . or . . . became insolvent as a result of the transfer or obligation." 740 ILCS 160/6(a).

"The Bankruptcy Code uses a balance sheet approach to insolvency." *In re Roti*, 271 B.R. 281, 294 (Bankr. N.D. Ill. 2002). That standard requires the Court to assess "whether a debtor's assets exceeded its liabilities at the time of a challenged transfer." *Id.* Likewise, the IUFTA "mirrors the balance-sheet test under the Bankruptcy Code" at 740 ILCS 160/3(a). *Zeigler*, 320

B.R. at 375.   In addition, Illinois law provides that a "debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id. quoting* 740 ILCS 160/3(b).

Relying on the expert testimony of Pakter, the Trustee contends the evidence as to Debtor's financial condition in June 2013 satisfies three traditional tests of insolvency—balance sheet, cash flow, and capital adequacy.   Defendants counter that Pakter's analysis is legally flawed and certain key factual assumptions are erroneous, such that his opinion is neither probative nor persuasive. Defendants have the better argument.

Pakter erroneously approached his review of Debtor's finances as if he were considering a corporate entity.   For example, Pakter opined that Debtor failed the capital adequacy test because he was on the verge of exhausting his retirement funds and had no other readily liquid assets for reserves.   That analysis makes sense for a business in need of consistent and reliable access to capital in order to sustain operations.   But individuals often have equity tied up in real property or stock or causes of action that cannot be quickly or easily converted to cash in hand.   Using a test designed to measure corporate solvency that does not fully account for the reality of individual debtors can lead to unreliable conclusions.

On the other hand, both the balance sheet and cash flow tests used by Pakter more closely track the insolvency tests under the IUFTA.   Those offer a more precise calculation that is attuned to individual circumstances.   However, Pakter took an unnecessarily narrow approach in applying the required standards to Debtor's situation.   With respect to the balance sheet analysis, Pakter correctly focused on the fair value of Debtor's available assets and liabilities on June 27, 2013. He calculated total assets of $24,368 based on a low-ball estimate of Debtor's retirement fund balance.   Cross-examination established a figure at least $5,000 higher.   Pakter also did not assign a value for Debtor's wage claim that allegedly went back to 2010 when his employment with

23

Aurelio's Franchise began.  The Trustee eventually settled the claim for $10,000 without attributing the funds paid to wages due during any particular time period.  The claim ultimately was not worth much, but it was not entirely worthless either.  Furthermore, Debtor claimed equitable interests of about $9,800 in his former marital home with Anne that is not reflected in Pakter's summary of his financial condition as of June 2013.[7]

Equally problematic is Pakter's overstatement of Debtor's liabilities based on his unsupported assumption that Debtor likely had more credit card debt than his financial records showed at the time of the transfer.  In doing so, Pakter inexplicably increased liabilities by over $12,000.  To determine solvency on a balance sheet basis, "a snapshot must be taken of a debtor's financial situation at the time of the transfer or shortly after the transfer, and the extant liabilities must be subtracted from the existing assets." *Ziegler*, 320 B.R. at 377.  Here, it was improper for Pakter to add liabilities that had not yet accrued.  *See id.*

Along the same lines, with respect to the cash flow test, Pakter reduced Debtor's inflow by $2,900 as he considered the retirement funds a short-term income source and increased the outflow for credit card debt.  Again, the goal is to review Debtor's finances at the point of the transfer.  Debtor still had at least $30,000 in his retirement account.  To be clear, using those funds to cover daily expenses is not a financially sound long-term strategy.  But that does not automatically exclude them from consideration as a viable income source for purposes of the insolvency test.  Similarly, concerning his debts, the issue is what the Debtor was actually required to pay in June 2013.  To assume based on a document showing higher credit card balances in December 2013

---

[7] Not to mention, the Trustee later determined that the Michigan Property sold in January 2013 had been significantly and intentionally undervalued by Anne.  He filed suit against multiple parties and recovered an additional $20,000 for Debtor's estate in settlement of that fraudulent conveyance action.  *See Metrou v. TJM Enterprise Grp., Ltd., et al.*, 17-ap-00469.

24

that Debtor likely owed that much six months earlier is inappropriate. Absent a reasonable explanation or supporting evidence, the Court declines to make that leap of logic.

The flaws in Pakter's balance sheet and cash flow analysis matter only if the $85,000 loan (and any accrued monthly payment) should *not* have been included in the calculation of Debtor's total liabilities. Debtor and Joe agreed to an $85,000 loan for Cami's debt, that Debtor told Dawn would be repaid by Cami annually in equal installments within five years. Yet Cami testified credibly that she neither asked Debtor to borrow funds from Aurelio's nor promised to repay the money. Nothing in the record suggests that Cami intended to be expressly or impliedly bound by Debtor's actions for her benefit. As such, any liability for the loan arguably rests with Debtor as opposed to Cami.

But Debtor's culpability, standing alone, does not necessarily mean the $85,000 should count as a liability under these solvency tests. It is true that Aurelio's treated the loan as a debt to be collected, not a gift. Its accountant prepared the note to be signed and carried the obligation on the company's books as a receivable. Still, it is unclear to the Court the actual expectations for repayment of such a significant sum. It is surprising that in a family-owned business with limited resources, no one followed up with Debtor or Cami about execution of the note, or reached out to Cami after the first payment due in June 2014 was not received. Joe testified about mentioning repayment to Debtor on occasion but he never pressed him to come up with any funds. By the time Debtor quit abruptly in June 2015, nearly two years had passed, leaving over $34,000 due and nothing paid.

Pakter concluded the entire $85,000 counted as a liability that, based on the proposal for annual payments totalling about $17,500, rendered Debtor insolvent in June 2013. While an argument can be made that the numbers support such a conclusion, the Court must also consider

25

the lack of enforcement. Joe's own testimony establishes that notwithstanding the note, Debtor was not strictly held to the stated terms. Under those circumstances, the insolvency analysis is impacted by the characterization of the loan as short-term (and due within 5 years) when it appears to have been treated by the parties as long-term (with flexible and/or extended repayment options). Because Pakter did not account for those factors, his analysis does not fully address the proper weight to give to the debt. Therefore, insolvency at the time of transfer or because of the transfer has not been conclusively established under either of the applicable tests.

The Court certainly appreciates the helpful assistance of Pakter in this case. Hindered by the passage of time and an uncooperative and shifty Debtor who refused to answer questions at his deposition in the adversary proceeding, Pakter's ability to fully assess Debtor's financial condition as of eight years ago was challenged. The Trustee attempted to fill in the blanks using Debtor's prior sworn testimony from other proceedings, but once Debtor invoked his Fifth Amendment right (as he is entitled to do) and the Court sustained Defendants' objections under Fed. R. Evid. 804 and 807, the admissible evidence on his finances was severely limited. The Trustee fell short of meeting his burden of proving insolvency but not for lack of effort in trying to overcome all these deficiencies.

## IV.     No Benefit to David

Section 550(a) allows the Trustee to recover from an individual or entity for whose benefit the fraudulent transfer was made. *See Bonded Fin. Servs.*, 838 F.3d at 891. The goal of such a policy is to ensure that the Trustee has the full range of responsible pockets from which to recoup payments that should have been dispersed to all creditors of Debtor, and not just a select few. *See id.* at 894-896. And so it is understandable that the Trustee pursued anyone with a connection to the Mokena Property or the Loan to Old Plank. Unfortunately, that put Cami's ex-husband David

26

in the crosshairs, even though at the time of the transfer in June 2013, he no longer held any legal or equitable interest in his former marital home. Only his name remained attached to the Loan, but under the terms of their marital settlement agreement, Cami was solely obligated to pay Old Plank.

In fact, by June 2013, David had returned to state court several times to enforce their deal requiring Cami to promptly remove him from the Loan or sell the Mokena Property now that she was living with Debtor. While it is true that David technically benefitted from the Loan being paid off, he was not in the least way enriched by the transfer to the detriment of Debtor's creditors. David's unrebutted testimony was that he knew nothing about Debtor's involvement in procuring the funds. The check to Old Plank does not reference Debtor. And David had no reason or right to ask his ex-wife, let alone her live-in fiancé, about the source of the money. His primary concern was with repaying the Loan for which he, on paper, remained jointly liable. If anything, David falls into the category of someone who in good faith "g[o]t a benefit because someone else received the money or property." *Id*. at 896. Those types of beneficiaries are not the intended targets for recovery of fraudulent conveyances nor is the underlying purpose of sections 544 or 548 served by holding them liable under section 550.

## Conclusion

This was undoubtedly a difficult case for all parties involved. An innocuous transfer to a non-creditor several years ago that was facilitated by a Debtor with questionable motives led to this lawsuit against arguably innocent parties. The Court does not fault the Trustee for doing his job here, that is, pursuing any asset that might provide a recovery to creditors. Debtor's understandable refusal to cooperate post-indictment made it even harder for the Trustee to meet his burden here. In the end, there was not enough evidence to establish a recoverable fraudulent

27

transfer under theories of either actual or constructive fraud against Cami, Stephen, David, or Old Plank.   For the foregoing reasons, judgment will be entered in favor of all Defendants on Counts I, II, and III of the amended complaint and against the Trustee.  A separate judgment will be entered pursuant to Fed. R. Bankr. P. 9021.

Dated:  April 27, 2022                              Entered:


_____

Honorable LaShonda A. Hunt
United States Bankruptcy Judge

28